STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
LEONEL CANOLA, A/K/A LEON VASQUEZ, DEFEND-
ANT-APPELLANT.

Argued September 27, 1976—Decided April 7, 1977.

*Mr. Edward P. Hannigan,* Assistant Deputy Public Defender, argued the cause for defendant (*Mr. Stanley C. Van Ness,* Public Defender, attorney).

*Mr. James Mayer,* Assistant Prosecutor, argued the cause for respondent (*Mr. Joseph C. Woodcock, Jr.,* Bergen County Prosecutor, attorney).

*Ms. Andrea R. Grundfest,* Assistant Prosecutor, argued the cause for *amicus curiae* (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney) ; *Messrs. David S. Baime* and *John J. De Cicco,* Deputy Attorneys General, of counsel).

The opinion of the court was delivered by
CONFORD, P. J. A. D., Temporarily Assigned. Defendant, along with three confederates, was in the process of robbing a store when a victim of the robbery, attempting to resist the perpetration of the crime, fatally shot one of the cofelons. The sole issue for our resolution is whether, under *N. J. S. A.* 2A:113-1, defendant may be held liable for felony murder. A divided part of the Appellate Division determined the question in the affirmative. 135 *N. J. Su-*

*per.* 224 (1975). Because of the dissent, the appeal is here as of right. *R.* 2:2–1(a).

The facts of this case are adequately stated in the opinion of the Appellate Division. 135 *N. J. Super.* at 227–229. For purposes of this determination they may be summarized as follows. The owner of a jewelry store and his employee, in an attempt to resist an armed robbery, engaged in a physical skirmish with one of the four robbers. A second conspirator, called upon for assistance, began shooting, and the store owner returned the gunfire. Both the owner and the felon, one Lloredo, were fatally shot in the exchange, the latter by the firearm of the owner.

Defendant and two others were indicted on two counts of murder, one count of robbery and one count of having been armed during the robbery. The murder counts were based on the deaths, respectively, of the robbery victim and the co-felon. After trial on the murder counts defendant was found guilty on both and was sentenced to concurrent terms of life imprisonment. The Appellate Division unanimously affirmed the conviction for the murder of the robbery victim, and this court denied a petition for certification addressed thereto. However, when the Appellate Division majority upheld the trial court's denial of a motion to dismiss the count addressed to the homicide of the co-felon, Judge Handler dissented.

Conventional formulations of the felony murder rule would not seem to encompass liability in this case. As stated by Blackstone about the time of the American Revolution, the rule was: "And if one intends to do another felony, and undesignedly kills a man, this is also murder." 4 Blackstone, *Commentaries** 200–201; and see *The State v. Cooper,* 13 *N. J. L.* 361, 370 (Sup. Ct. 1833) ; *State v. Madden,* 61 *N. J.* 377, 384 (1972). In such case the felonious intent supplies the malice requisite for murder. *Ibid.* A recent study of the early formulations of the felony murder rule by such authorities as Lord Coke, Foster and Blackstone and of later ones by Judge Stephen and Justice Holmes concluded that they

were concerned solely with situations where the felon or a confederate did the actual killing. Comment, 24 *Rutgers L. Rev.* 591, 600–601 (1970); and see *Commonwealth v. Redline,* 391 *Pa.* 486, 137 *A.* 2d 472, 480 (Sup. Ct. 1958). Contrary to the division of view in the modern American cases on the point (see *infra*), it has been observed that the English courts never applied the felony murder rule to hold a felon guilty of the death of his co-felon at the hands of the intended victim. Prevezer, "The English Homicide Act: A New Attempt To Revise The Law Of Murder," 57 *Col. L. Rev.* 624, 634 (1957); and see *Comment, ubi cit. supra,* 24 *Rutgers L. Rev.* at 600–601.

The precise issue in the present case is whether a broader concept than the foregoing — specifically, liability of a felon for the death of a co-felon effected by one resisting the felony — is required by the language of our statute applicable to the general area of felony murder. *N. J. S. A.* 2A:113–1. This reads:

If any person, in committing or attempting to commit arson, burglary, kidnapping, rape, robbery, sodomy or any unlawful act against the peace of this State, of which the probable consequences may be bloodshed, kills another, *or if the death of anyone ensues from the committing or attempting to commit any such crime or act;* or if any person kills a judge, magistrate, sheriff, coroner, constable or other officer of justice, either civil or criminal, of this state, or a marshal or other officer of justice, either civil or criminal, of the United States, in the execution of his office or duty, or kills any of his assistants, whether specially called to his aid or not, endeavoring to preserve the peace or apprehend a criminal, knowing the authority of such assistant, or kills a private person endeavoring to suppress an affray, or to apprehend a criminal, knowing the intention with which such private person interposes, *then such person so killing is guilty of murder.* (emphasis added).

This statute is traceable substantially intact to the Law of March 18, 1796, §66, *N. J. Laws* [1701-1820] 262. The only substantive changes have been the inclusion of kidnapping among the felonies specified and the excision of the original prescription of punishment by death. The Appellate

Division majority was of the view that the above-emphasized portion of the statute, referred to by it as the "ensues clause," compelled the result it arrived at. It said (135 *N. J. Super.* at 235):

\* \* \* We think it is clear that the clause was not intended to be mere surplusage where it appears that the other provisions of the statute, standing alone, embody the concept of felony murder under the common law. Such an interpretation would violate one of the cardinal rules of statutory construction that full force and effect must be given, if possible, to every word, clause and sentence of a statute.

\*     \*     \*     \*     \*     \*     \*     \*

\* \* \* In our view the statute indicates an intention on the part of the Legislature to extend criminal responsibility beyond that imposed upon a felon at common law and to hold liable all participants in an armed robbery for deaths which occur during the commission of the crime.[1]

Judge (now Justice) Handler, in dissenting, cited the decisions representing the majority view in those other jurisdictions which had considered the general question, and said they hold that "a felon cannot be found guilty for the death of an accomplice occurring during the commission of the felony." 135 *N. J. Super.* at 236. As to the ensues clause of the statute, Judge Handler stated (*id.* at 237–238):

In my view the "ensues clause" is not the catalyst which transmutes criminal culpability in the context of a felony-murder from agency to proximate cause. No cogent argument has been presented that, by the inclusion of the language of the "ensues clause," the Legislature intended to affix criminal responsibility upon a felon for murder in the highest degree for the justifiable, accidental or unintended death of a co-felon on the theory of proximate cause. Rather, the purpose of the "ensues clause" would appear to be a legislative attempt to insure a broadened scope of criminal responsibility with

---

[1]Two trial court decisions are in accord. *State v. Kress*, 105 *N. J. Super.* 514 (Law Div. 1969) (probably distinguishable in that there the decedent was used by the defendant as a shield in seeking to escape; see discussion of "shield" cases, *infra*, pp. 218–219; *State v. Burton*, 130 *N. J. Super.* 174 (Law Div. 1974). *Contra*: *State v. Suit*, 129 *N. J. Super.* 336 (Law Div. 1974).

respect to a defendant who, as a primary actor or in concert with or through the criminal agency of another, actually or constructively, but in furtherance of the felony, causes the death of another person.

While the statute, even without the "ensues clause," might well be so interpreted and applied, it was within the legislative province to give unmistakeable and emphatic expression of this intent. It does not follow, therefore, as thought by the majority and expressed in *State v. Burton*, 130 *N. J. Super.* 174 (Law Div. 1974), that the "ensues clause" is mere surplusage and acquires a sensible meaning, together with the final phrase of the statute, only upon a thesis of proximate cause. On the contrary, in my view the "ensues clause" underscores a legislative intent, in defining felony murder, to expand the class of victims whose death might occur in the course of a felony and to cover killings which might otherwise be considered too distantly connected with the felony, provided they fall within its *res gestae*. So understood, the entire statute makes reasonable sense when limited only to a defendant who actually participates in the killing, or does so through the agency of a partner in the crime, whether as a principal or an aider and abettor, whether directly or indirectly, by acts or conduct in furtherance of the commission of the felony.

For reasons to be more fully explicated, we are in accord with the conclusion arrived at in the dissent.

Before attempting, through analysis of the statutory language itself, a resolution of the contrasting views of the statute entertained below, it will be helpful to survey the progress of the pertinent law in the other American jurisdictions. Preliminarily, however, it seems significant of the contemporaneous and subsequent general assessment of the meaning of the ensues clause in our statute that prior to the past decade, and over the long period of its presence in our statute books, there is no apparent evidence that any felon was ever charged with murder for a death at the hands of persons not associated with the felonious undertaking. *Cf. Pringle v. N. J. Dept. of Civil Service*, 45 *N. J.* 329, 332–333 (1965); *Kingsley v. Hawthorne Fabrics, Inc.*, 41 *N. J.* 521, 528 (1964).

It is clearly the majority view throughout the country that, at least in theory, the doctrine of felony murder does not extend to a killing, although growing out of the commission of the felony, if directly attributable to the act of

one other than the defendant or those associated with him in the unlawful enterprise. *Commonwealth ex rel. Smith v. Myers,* 438 *Pa.* 218, 261 *A.* 2d 550 (Sup. Ct. 1970) ; *People v. Washington,* 62 *Cal.* 2d 777, 44 *Cal. Rptr.* 442, 402 *P.* 2d 130 (Sup. Ct. 1965) ; *Commonwealth v. Balliro,* 349 *Mass.* 505, 209 *N. E.* 2d 308 (Sup. Jud. Ct. 1965) ; *People v. Wood,* 8 *N. Y.* 2d 48, 201 *N. Y. S.* 2d 328, 167 *N. E.* 2d 736 (Ct. App. 1960) ; *People v. Warren,* 44 *Mich. App.* 567, 205 *N. W.* 2d 599 (Ct. App. 1973) ; *Alvarez v. District Ct. In and For City & Cty. of Denver,* 186 *Colo.* 37, 525 *P.* 2d 1131 (Sup. Ct. 1974) ; *State v. Garner,* 238 *La.* 563, 115 *So.* 2d 855 (Sup. Ct. 1959) ; *State v. Majors,* 237 *S. W.* 486 (Mo. Sup. Ct. 1922) ; *Commonwealth v. Moore,* 121 *Ky.* 97, 88 *S. W.* 1085 (Ct. App. 1905) ; *Sheriff, Clark County v. Hicks,* 89 *Nev.* 78, 506 *P.* 2d 766 (Sup. Ct. 1973) ; *State v. Oxendine,* 187 *N. C.* 658, 122 *S. E.* 568 (Sup. Ct. 1924). See Annot. 56 *A. L. R.* 3d 239 (1974). This rule is sometimes rationalized on the "agency" theory of felony murder.[2]

A contrary view, which would attach liability under the felony murder rule for *any* death proximately resulting from the unlawful activity — even the death of a co-felon — notwithstanding the killing was by one resisting the crime, does not seem to have the present allegiance of any court. *See Johnson v. State,* 386 *P.* 2d 336 (Okl. Cr. App. 1963) ; *Miers v. State,* 157 *Tex. Cr. R.* 572, 251 *S. W.* 2d 404 (Cr. App. 1952) ; and *Hornbeck v. State,* 77 *So.* 2d 876 (Fla. Sup. Ct. 1955), in all of which either an officer or other innocent person was killed. But *cf. Taylor v. Superior Court of Alameda County,* 3 *Cal.* 3d 578, 91 *Cal. Rptr.* 275, 477 *P.* 2d

---

[2]The classic statement of the theory is found in an early case applying it in a context pertinent to the case at bar, *Commonwealth v. Campbell,* 89 *Mass.* (7 *Allen*) 541, 544 (Sup. Jud. Ct. 1863), as follows :

No person can be held guilty of homicide unless the act is either actually or constructively his, and it cannot be his act in either sense unless committed by his own hand or by some one acting in concert with him or in furtherance of a common object or purpose.

131 (1970), another phase of which is reported in 12 *Cal. 3d* 686, 117 *Cal. Rptr.* 70, 527 *P.* 2d 622 (Sup. Ct. 1974) (where a co-felon was killed).

At one time the proximate cause theory was espoused by the Pennsylvania Supreme Court, *Commonwealth v. Moyer,* 357 *Pa.* 181, 53 *A.* 2d 736 (Sup. Ct. 1947) (murder conviction for death of gas station attendant in exchange of gunfire during robbery, without proof that a felon fired fatal shot) ; *Commonwealth v. Almeida,* 362 *Pa.* 596, 68 *A.* 2d 595 (Sup. Ct. 1949) ; *cert.* den. 339 *U. S.* 924, 70 *S. Ct.* 614, 94 *L. Ed.* 1346, reh. den. 339 *U. S.* 950, 70 *S. Ct.* 798, 94 *L. Ed.* 1364, *cert.* den. 340 *U. S.* 867, 71 *S. Ct.* 83, 95 *L. Ed.* 633 (1950).[3] The reasoning of the *Almeida* decision, involving the killing of a policeman shot by other police attempting to apprehend robbers, was distinctly circumvented when the question later arose whether it should be applied to an effort to inculpate a defendant for the killing of his co-felon at the hands of the victim of the crime. *Commonwealth v. Redline,* 391 *Pa.* 486, 137 *A.* 2d 472 (Sup. Ct. 1958). The court there held against liability. Examining the common-law authorities relied upon by the *Almeida* majority, the *Redline* court concluded:

As already indicated, *Almeida* was, itself, an extension of the felony-murder doctrine by judicial decision and is not to be extended in its application beyond facts such as those to which it was applied.

137 *A.* 2d at 482. The court then held that "in order to convict for felony murder, *the killing must have been done by the defendant or by an accomplice or confederate or by one acting in furtherance of the felonious undertaking."*

---

[3]Criticized in the leading commentary supporting adherence to the agency theory or felony murder, Morris, "The Felon's Responsibility For The Lethal Acts Of Others", 105 *U. Pa. L.* Rev. 50 (1956) ; in accord with such criticism, see also Ludwig, "Foreseeable Death In Felony Murder", 18 *U. Pitt. L. Rev.* 51 (1956) ; Comment, 71 *Harv. L. Rev.* 1565 (1958) ; Comment, 106 *U. Pa. L. Rev.* 1176 (1958).

137 *A.* 2d at 476 (emphasis in original). The court refused, however, actually to overrule the *Almeida* decision, thereby creating a distinction (although the opinion indicates it was a half-hearted one; 137 *A.* 2d at 483) between the situation in which the victim was an innocent party and the killing therefore merely "excusable" and that in which the deceased was a felon and the killing thus "justifiable."[4] Twelve years later the Pennsylvania court did overrule *Almeida* in a case involving Almeida's companion, Smith. (*Commonwealth ex rel. Smith v. Myers,* 438 *Pa.* 218, 261 *A.* 2d 550 (Sup. Ct. 1970)). The court noted, *inter alia,* the harsh criticism leveled against the common-law felony rule, its doubtful deterrent effect, the failure of the cases cited in *Almeida* to support the conclusions reached therein, the inappropriateness of tort proximate-cause principles to homicide prosecution, and the "will-of-the-wisp" distinction drawn by the *Almeida* court between justifiable and excusable homicides. 261 *A.* 2d at 553–558. It concluded, "beyond a shadow of a doubt * * * *Almeida* and *Thomas* [*Commonwealth v. Thomas,* 382 *Pa.* 639, 117 *A.* 2d 204] constituted iberrations [sic] in the annals of Anglo-American adjudicature." *Id.* at 553.

The course of the decisions in Michigan illustrates the influence of the Pennsylvania cases in the development of the felony murder rule in other jurisdictions. In *People v. Podolski,* 332 *Mich.* 508, 52 *N. W.* 2d 201 (Sup. Ct.), *cert.* den. 344 *U. S.* 845, 73 *S. Ct.* 62, 97 *L. Ed.* 657, reh. den. 344 *U. S.* 888, 73 *S. Ct.* 185, 97 *L. Ed.* 687 (1952), the bullet killing the deceased officer came from the revolver of a fellow

---

[4]Although, as will be seen, this distinction survives in a few jurisdictions, it has been criticized in principle, since, *inter alia,* the criminal immunity or liability of the third person killer is irrelevant to the criminal culpability of the accused felon. See Comment, 71 *Harv. L. Rev.* 1565, 1566 (1958). See also *Commonwealth ex rel. Smith v. Myers, supra* (261 *A.* 2d at 558) ; *Commonwealth v. Balliro, supra* (209 *N. E.* 2d at 314) ; *People v. Washington, supra* (44 *Cal. Rptr.* 442, 402 *P.* 2d at 132) ; *Morris, op. cit. supra,* 105 *U. of Pa. L. Rev.* at 56 ; Comment, *op. cit. supra,* 106 *U. of Pa. L. Rev.* at 1178.

officer attempting to stop defendant's armed robbery of a bank. In affirming the murder conviction, the court adopted both the language and reasoning of the Pennsylvania court in the early case of *Commonwealth v. Moyer, supra,* to the effect that if a robber sets in motion a chain of events which should have been within his contemplation, he is liable for any death which results. 52 *N. W.* 2d at 204.

After the Pennsylvania court changed course in *Redline, supra,* the Michigan court followed suit in *People v. Austin,* 370 *Mich.* 12, 120 *N. W.* 2d 766 (Sup. Ct. 1963), where defendants' indictments for the slaying of their accomplice by the robbery victim were quashed. Relying heavily on Pennsylvania's curtailment of the expansion of the felony murder rule, the court, while not overruling *Podolski,* nonetheless refused to extend liability to instances where the deceased was a co-felon.

Although the Michigan Supreme Court has not had occasion to reconsider *Podolski* since, two intermediate appellate court decisions have cast doubt on its continued viability. In *People v. Scott,* 29 *Mich. App.* 549, 185 *N. W.* 576 (Ct. App. 1971), the court rejected the application of tort proximate cause principles to homicide prosecutions. Although the case involved an involuntary manslaughter conviction for the death of a policeman in an automobile collision during an automobile chase, the court's requirement of a "more direct causal connection between the criminal conduct of the defendant and the homicide charged" and its reliance on the later Pennsylvania decisions are equally applicable to charges of felony murder. In a case directly involving the felony murder rule, another lower appellate court held, in *People v. Warren,* 44 *Mich. App.* 567, 205 *N. W.* 2d 599 (Ct. App. 1973), that the operative fact in determining the applicability of the rule was whether the defendant did the killing, not the identity of the victim.

The Pennsylvania developments were also influential in Illinois. Prior to any of the Pennsylvania cases cited above, Illinois had adopted a rule of proximate causation in *People*

*v. Payne,* 359 *Ill.* 246, 194 *N. E.* 539 (Sup. Ct. 1935), where a felon's conviction of murder for the death of a bystander was affirmed despite the absence of any proof of who fired the fatal shot. The court found this fact immaterial (194 *N. E.* at 543):

> It reasonably might be anticipated that an attempted robbery would meet with resistance, during which the victim might be shot either by himself or some one else in attempting to prevent the robbery, and those attempting to perpetrate the robbery would be guilty of murder.

Nevertheless, following the Pennsylvania *Redline* decision, the Illinois courts refused to apply the proximate causation test where the decedent was an accomplice of the defendant killed by a victim of the felony. *People v. Morris,* 1 *Ill. App.* 3d 566, 274 *N.E.* 2d 898 (Ct. App. 1971); *People v. Hudson,* 6 *Ill. App.* 3d 1062, 287 *N. E.* 2d 41 (Ct. App. 1972). The rationale, quite inconsistent with that applied in *Payne, supra,* was that the lethal act was not done in furtherance of the common design to commit a felony. 274 *N.E.* 2d at 901; 287 *N.E.* 2d at 43.

In the most recent Illinois case, *People v. Hickman,* 12 *Ill. App.* 3d 412, 297 *N.E.* 2d 582 (Ct. App. 1973), aff'd 59 *Ill.* 2d 89, 319 *N.E.* 2d 511 (Sup. Ct. 1974), *cert.* den. 421 *U. S.* 913, 95 *S. Ct.* 1571, 43 *L Ed.* 2d 779 (1975), where an officer chasing burglars mistakenly shot and killed a fellow officer, and liability was imposed pursuant to *Payne, supra,* yet another theory of differentiation of the co-felon killing cases was advanced — the dubious assumption-of-risk concept that the co-felon "assisted in setting in motion a chain of events which was the proximate cause of his death and therefore in the criminal law as in the civil law there is no redress for the victim". 297 *N.E.* 2d at 586.

The California cases have taken a wholly unique course in this area of the criminal law. The Court of Appeal, influenced by the early Pennsylvania cases, first adopted the proximate cause theory. In *People v. Harrison,* 176 *Cal.*

*App.* 2d 330, 1 *Cal. Rptr.* 414 (Ct. App. 1959), the court held the defendants guilty of first degree murder when the owner of a store being robbed exchanged gunfire with the robbers and killed an employee. But in *People v. Washington,* 62 *Cal.* 2d 777, 44 *Cal. Rptr.* 442, 402 *P.* 2d 130 (Sup. Ct. 1965), the Supreme Court refused to hold a surviving felon liable for the death of a co-felon, instead reverting to the common law view of *Campbell, supra,* and overruling *People v. Harrison.* It said (44 *Cal. Rptr.* at 446, 402 *P.* 2d at 134):

Accordingly, for a defendant to be guilty of murder under the felony-murder rule the act of killing must be committed by the defendant or by his accomplice acting in furtherance of their common design.

In *dicta,* however, the court stated that it was not necessary to invoke the felony murder rule in order to imply the malice requisite for murder and that such malice is evident when the defendant does an act (*apart* from the felony) "that involves a high degree of probability that it will result in death". 44 *Cal. Rptr.* at 446, 402 *P.* 2d at 134. Accordingly, in *People v. Gilbert,* 63 *Cal.* 2d 690, 47 *Cal. Rptr.* 909, 408 *P.* 2d 365 (Sup. Ct. 1965), vacated other grds. 388 *U. S.* 263, 87 *S. Ct.* 1951, 18 *L. Ed.* 2d 1178 (1967), while adhering to the notion that for the strict liability of the felony murder rule to apply the felon or his accomplice must do the killing, the court recognized the implication of *Washington* that "entirely apart from the felony murder rule, malice may be established when a defendant initiates a gun battle, and that under such circumstances he may be convicted of murder for a killing committed by another." 47 *Cal. Rptr.* at 917, 408 *P.* 2d at 373. But the court reversed a conviction of a bank robber for the murder of his accomplice killed by a resisting police officer. It held that while the evidence would have permitted a conviction on the latter theory if the jury had been instructed to determine whether the officer's act was "in response to a shooting initiated by" defendant, here the jury had been

told erroneously that defendant could be convicted for that killing without proof of malice and "solely on the ground that [he] committed a robbery that was the proximate cause of [the] accomplice's death". 47 *Cal. Rptr.* at 917, 408 *P.* 2d at 373.

The *Washington* dictum was refined by a sharply divided California Supreme Court in *Taylor v. Superior Court of Alameda County,* 3 *Cal.* 3d 578, 91 *Cal. Rptr.* 275, 477 *P.* 2d 131 (1970) (see another phase of the case in 12 *Cal.* 3d 686, 117 *Cal. Rptr.* 70, 527 *P.* 2d 622, 625 (Sup. Ct. 1974)), where the gun battle was initiated by the operator of the liquor store being robbed, killing one of the co-felons. In affirming the denial of a motion to set aside the criminal information, the court noted that who fired the first shot was not determinative, but that the central inquiry, to be resolved by the fact-finder, was "whether the *conduct* of a defendant or his accomplices was sufficiently provocative of lethal resistance to support a finding of implied malice." 91 *Cal. Rptr.* at 278, 477 *P.* 2d at 134. (emphasis in original). Hence "depending upon the circumstances, a gun battle can be initiated by acts of provocation falling short of firing the first shot." *Ibid.* Three dissenting justices thought the majority were repudiating previous holdings of the court that "robbers cannot be convicted of murder for a killing by a victim unless the robbers commit malicious acts, in addition to the acts constituting the underlying felony, which demonstrate culpability beyond that of other robbers". 91 *Cal. Rptr.* at 279, 477 *P.* 2d at 135, 141.

To be distinguished from the situation before us here, and from the generality of the cases discussed above, are the so-called "shield" cases. The first of these were the companion cases of *Taylor v. State,* 41 *Tex. Cr. R.* 564, 55 *S.W.* 961 (Cr. App. 1900) aff'd 63 *S.W.* 330 (Cr. App. 1901), and *Keaton v. State,* 41 *Tex. Cr. R.* 621, 57 *S.W.* 1125 (Cr. App. 1900). In attempting to escape after robbing a train, defendants thrust the brakeman in front of them as a shield, as a result of which he was fatally shot by law

officers. The court had no difficulty in finding defendants guilty of murder. The court in *Taylor* noted the correctness of the *Campbell* case doctrine that a person could not be held liable for homicide unless the act is either actually or constructively committed by him, but indicated it was inapplicable to a case where defendants forced deceased to occupy a place of danger in order that they might carry out the crime. 55 *S.W.* at 963–964. In *Keaton,* the court said defendant would be responsible for the "reasonable, natural and probable result of his act" of placing deceased in danger of his life. 57 *S.W.* at 1129. The conduct of the defendants in cases such as these is said to reflect "express malice", justifying a murder conviction. *Commonwealth v. Redline, supra* (137 *A.* 2d at 482). See also *Wilson v. State,* 188 *Ark.* 846, 68 *S.W.* 2d 100 (Sup. Ct. 1934); *Johnson v. State,* 252 *Ark.* 1113, 482 *S.W.* 2d 600 (Sup. Ct. 1972); *State v. Kress, supra* (105 *N. J. Super.* 514).

This review of the development in this country of the felony murder rule in relation to culpability for lethal acts of non-felons shows that, despite its early limitation to deadly acts of the felons themselves or their accomplices, the rule has undergone several transformations and can no longer be stated in terms of universal application. As one commentator noted, it appears from the reported cases that up until 1922 all cases in the general field denied liability; the period from 1922 to 1935 was one of vacillation; and cases from 1935 (and the Illinois decision in *People v. Payne, supra*) to 1956 tended to impose liability on the grounds of proximate causation where the defendant knew that forceful resistance could be expected. *Morris, supra,* 105 *U. Pa. L. Rev.* at 57, note 40. But when the Pennsylvania court in *Redline, supra,* overruled its prior holding of liability, in apparent return to the original position of the common law, a number of other jurisdictions followed suit, and the trend since has been towards nonliability; see Annot., *cit. supra* (56 *A.L.R.* 3d 237).

Reverting to our immediate task here, it is to determine whether our own statute necessarily mandates the proximate cause concept of felony murder, as thought by the Appellate Division majority. It is fair to assume, initially, that the Legislature had no special reason in 1796 to ordain a rule of felony murder beyond that generally accepted in Anglo-American jurisprudence at the end of the eighteenth century. As above noted, there was then no precedent, either English or American, for holding the felon for killings at the hands of others than the felon himself or those confederated with him — that is to say, the so-called agency rule held sway. But as seen above, the view of the Appellate Division was that the "ensues clause" of *N. J. S. A.* 2A:113-1 must be deemed to have expanded the culpability of the felon to killings by others not confederated with him, if proximately related to the felonious enterprise, else the clause would be meaningless surplusage in the act. However, other plausible motivations for the ensues clause can be postulated consistent with a legislative intent to adhere to the traditional limitations of the felony murder doctrine.

Judge Handler, dissenting below, suggested that the purpose of the clause might have been to expand the class of victims of the felon's acts to cover all killings within the *res gestae* of the felony, even if they formerly would have been considered too distant to be connected therewith, so long as in furtherance of the felony. 135 *N. J. Super.* at 238. This view is also advanced by the Comment in *Rutgers L. Rev., op. cit. supra* (24 *Rutgers L. Rev.* at 606). It seems to us, moreover, that the ensues clause could well have been intended to ensure effectuation of either or both of the following concomitants of the traditional felony murder rule: (a) that accidental or fortuitous homicides "ensuing" from the felony were contemplated for inclusion, the purpose of the statutory language being to repel the inference of a requisite of intent to kill, normally associated with the unqualified word "kill" as used in the initial clause

of the section; and (b) that liability extend to acts of or participation by the accomplice of the killer-felon, as well as those of the killer himself. See, *e. g., State v. Carlino,* 98 *N. J. L.* 48, 53 (Sup. Ct. 1922) aff'd *per curiam* 99 *N. J. L.* 292 (E. & A. 1923).

The significance of these suggested alternative hypotheses for the ensues clause is not persuasively diluted by the contention of the Appellate Division majority that the initial clause of the section is a fully self-contained prescription of the standard felony murder rule without the ensues clause. In refuting a similar position as to the proper construction of the statute taken by the Law Division in *State v. Kress, supra,* 105 *N. J. Super.* at 521, the Rutgers Comment cited above cogently observes: "Apparently, the [*Kress*] court assumed that the [ensues] clause would be surplusage unless it reached conduct clearly not covered in its absence; but the clause is neither meaningless nor redundant °if it clarifies the meaning and scope of another portion of the statute". 24 *Rutgers L. Rev.* at 605. We agree.

Finally, it is inescapable that the ensues clause is connected with the conclusion of the section, "then such person so killing is guilty of murder". This fortifies the view that even as to a death which "ensues" from the commission or attempt to commit the felony, liability for murder is intended to be restricted to the person "so killing", *i.e.,* the felon or his agents, not third persons, conformably with the limitation of the Pennsylvania *Redline* doctrine. 24 *Rutgers L. Rev.* at 603.

Our decided cases have readily accommodated conventional applications of the felony murder rule to the "ensues" verbiage of the statute. Thus, in *Roesel v. State,* 62 *N. J. L.* 216 (E. & A. 1898), responding to defendant's contention that since his accomplice rather than he had struck the fatal blow in the course of the robbery, he could not be guilty of murder, the *Roesel* court said (at 223; emphasis added);

Roesel and Manshande were engaged in a common purpose — the robbery of the deceased. Both were principals and equally guilty for the acts done by either, *and if death ensued from the committing or attempting to commit such a crime*, the offence was murder, whether the blow was struck by the one or the other. (emphasis added).

In *State v. Carlino, supra* (98 *N. J. L.* 48), defendant was not at the scene of the crime nor was he aware of the killing. Nonetheless the court found that in enacting the ensues clause, the Legislature "clearly intended that a man might be held guilty [of murder] although he was not the actual assailant if he was guilty on the theory of constructive presence." *Id.* at 53. In the course of this interpretation of the ensues clause, the court addressed the issue of the impact of the relevant statutory sections, *N. J. S. A.* 2A:113–1 and *N. J. S. A.* 2A:113–2, formerly *L.* 1898, *c.* 235, §§ 106 and 107, pp. 824–825, and found there was no intent to change the common law:

Our legislation in the sections cited does not suggest any intent to change the law. The crime remains the same crime as before, and the legislation has merely made a distinction with a view to the difference in the punishment between the most heinous and the least aggravated grades of murder * * *.

*Id.* at 53.

See also *State v. Rosania,* 33 *N. J.* 267 (1960) *cert.* den. 365 *U. S.* 864, 81 *S. Ct.* 828, 5 *L. Ed.* 2d 826 (1961), wherein defendant was held guilty of murder for "fingering" a store robbery in which there was a killing. The court described the murder indictment as being "for felony murder based upon a killing *ensuing from* the commission of a robbery. *N. J. S.* 2A:113–1 and 2." (*Id.* at 269; emphasis added).

The content and history of *N. J. S. A.* 2A:113–2 affords additional corroboration of the foregoing views as to the intent of the ensues clause in *N. J. S. A.* 2A:113–1. The former section reads:

Murder which is perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, *or which is committed in perpetrating or attempting to perpetrate arson, burglary, kidnapping, rape, robbery or sodomy,* or which is perpetrated in the course or for the purpose of resisting, avoiding or preventing a lawful arrest, or of effecting or assisting an escape or rescue from legal custody, or murder of a police or other law enforcement officer acting in the execution of his duty or of a person assisting any such officer so acting, is murder in the first degree. Any other kind of murder is murder in the second degree. A jury finding a person guilty of murder shall designate by their verdict whether it be murder in the first degree or in the second degree. (emphasis added).

The main contours of this section derive from *L.* 1839, p. 147, sec. 1, which set the present status of felony murder as first degree. That act superseded *L.* 1838, p. 183, entitled "An Act to abolish the punishment of death in certain cases," which created degrees of the crime of murder. It provided that murder "when perpetrated without any design to effect death, by a person engaged in the commission of any felony, shall be murder in the third degree." The wording clearly contemplated the felon as the perpetrator of the act of killing. The superseding statute of 1839 and its successors down to *N. J. S. A.* 2A:113–2 are notable for omission of the alleged separate category of offenders represented by the ensues clause of *N. J. S. A.* 2A:113–1. Since no specification of degree of murder was ever fixed for a category articulated in terms of offenders within the ensues clause, and it would hardly be likely that the Legislature would fail to provide for it if it were not regarded as subsumed within the initial clause of *N. J. S. A.* 2A:113–1, it is fair to assume that it was so regarded and that the ensues clause was thought by the 1838, 1839 and subsequent legislatures to have been intended to be an amplification of the initial clause rather than the designation of a separate category of offenders.

We have already alluded to the anomaly involved in extending the inculpatory effect of our felony murder statute to lethal acts by persons not associated with the felonious activity when no apparent effort, prior to the *Kress* case,

*supra,* to use the statute for such a purpose had been made by prosecutors in our entire history since the enactment of the statute in 1796.[5] A standard New Jersey text alludes to the question and states that while the point has not been passed upon by the court of last resort it is "doubtful that felons engaged in perpetrating a robbery are guilty of felony murder if, during the course of the robbery, a third person draws a gun, or uses one to aid in repulsing the robbers and in so doing accidentally kills another person." 2 Schlosser, *Criminal Laws of New Jersey* (3d ed. 1970) § 57.16, p. 94.

With such background, and assuming the statute is facially susceptible of the interpretation here advocated by the State, it is appropriate to consider the public policy implications of the proposed doctrine as an extension of prior assumptions in this State as to the proper limitations of the felony murder rule.

Most modern progressive thought in criminal jurisprudence favors restriction rather than expansion of the felony murder rule. A leading text states: "The felony murder rule is somewhat in disfavor at the present time. The courts apply it when the law requires, but they do so grudgingly and tend to restrict its application where the circumstances permit." *Perkins on Criminal Law* (2d ed. 1969) 44. It has frequently been observed that although the rule was logical at its inception, when all felonies were punishable by death, its survival to modern times when other felonies are not

---

[5]Indeed, the only allusion to the possibility of such a basis of liability in our reports is found in *State v. Bunk,* 4 *N. J.* 461, *cert.* den. 340 *U. S.* 839, 71 *S. Ct.* 25, 95 *L. Ed.* 615 (1950). Error was assigned, on appeal from a murder conviction, to an instruction to prospective jurors on the *voir dire* "that if deceased was killed by a third person, not acting in concert or having any connections with defendants, nevertheless they would be guilty of murder in the first degree". 4 *N. J.* at 467. The Supreme Court found it unnecessary to pass on the proposition there stated because the trial judge in charging the jury at the end of the case corrected the foregoing instruction by telling the jury it was erroneous and that they should disregard it. *Id.* at 468.

thought to be as blameworthy as premeditated killings is discordant with rational and enlightened views of criminal culpability and liability. *Id.* at 44; Comments to A. L. I. *Model Penal Code,* Tentative Draft No. 9 (1959), Section 201.2, p. 37 ("Despite the generality of the [felony murder] rule in the United States and the frequency with which it is deemed applicable to even accidental homicide, principled argument in its defense is hard to find"); Proposed *New Jersey Penal Code,* Vol. II Commentary, 157 (stating the same view as the preceding quotation from the *Model Penal Code* Comment); Prevezer, *op. cit. supra,* 57 *Col. L. Rev.* at 634; Comment, *op. cit. supra,* 24 *Rutgers L. Rev.* at 595.[6]

The final report of the New Jersey Criminal Law Revision Commission was, however, unwilling totally to reject the felony murder rule, concluding instead:

> It is true that we have no way of knowing how many of the homicides resulting in felony murder convictions were committed purposefully, knowingly or recklessly and how many were negligent or accidental. But it is our belief that this rule of law does lead some to refuse to assume a homicidal risk in committing other crimes. Vol. II Commentary, *New Jersey Penal Code,* p. 158.

The proposed *New Jersey Penal Code* does nevertheless offer limited defenses not hitherto available under the felony murder rule, and it confines the rule to deaths caused by the felon or his co-felons "in the course of and in furtherance of [the felony]." *New Jersey Penal Code* §2C:11-3 (Final Report 1971). This is standard "agency theory" formulation and would seem intended to exclude liability for acts of persons other than felons or co-felons though generally arising out of the criminal episode.

---

[6]The felony murder rule has also been described as "highly punitive and objectionable as imposing the consequences of murder upon a death wholly unintended." Pirsig, "Proposed Revision of the Minnesota Criminal Code", 47 *Minn. L. Rev.* 417, 427–428 (1963); also as a "hold-over from the days of our barbarian Anglo-Saxon ancestors of pre-Norman days [having] very little right to existence in modern society". Mueller, "Criminal Law and Administration," 34 *N. Y. U. L. Rev.* 83, 98 (1959).

■ ■ In view of all of the foregoing, it appears to us regressive to extend the application of the felony murder rule beyond its classic common-law limitation to acts by the felon and his accomplices, to lethal acts of third persons not in furtherance of the felonious scheme. The language of the statute does not compel it, and, as indicated above, is entirely compatible with the traditional limitations of the rule. Tort concepts of foreseeability and proximate cause have shallow relevance to culpability for murder in the first degree. Gradations of criminal liability should accord with degree of moral culpability for the actor's conduct. See the compelling thesis for rejection of the proximate cause theory of felony murder by Professor Morris in the article cited above, 105 *U. Pa. L. Rev.*, esp. at 67–68.

It is our judgment that if the course of the law as understood and applied in this State for almost 200 years is to be altered so drastically, it should be by express legislative enactment.

The judgment of the Appellate Division is modified so as to strike the conviction and sentencing of defendant for murder of the co-felon Lloredo.

SULLIVAN, J. (concurring in result only). The practical result of the majority holding is that even though some innocent person or a police officer be killed during the commission of an armed robbery, the felon would bear no criminal responsibility of any kind for that killing as long as it was not at the hand of the felon or a confederate. The legislative intent, as I see it, is otherwise.

The thrust of our felony murder statute, *N. J. S. A.* 2A: 113–1, is to hold the criminal liable for any killing which ensues during the commission of a felony, even though the felon, or a confederate, did not commit the actual killing. The only exception I would recognize would be the death of a co-felon, which could be classified as a justifiable homicide and not within the purview of the statute.

The Legislature should act promptly to clarify the situation resulting from the majority opinion. If it does not extend the felony murder statute to encompass a killing during the commission of a felony not at the hand of the felon or confederate, it should, at least, provide that the felon be chargeable with manslaughter for such killing (in addition to liability for the felony).

I therefore concur in the result but only for the reason stated above.

Justice PASHMAN joins this opinion concurring in result only.

HUGHES, C. J., dissenting. I respectfully dissent from the opinion of the majority here, and would affirm the decision of the Appellate Division, 135 *N. J. Super.* 224, for the precise reasons stated in its majority opinion. I certainly believe that what was there referred to as the "ensues clause" can have no other logical or legislatively intended meaning than to extend criminal liability, in a causative sense, to death which ensues or is proximately caused by initiation and furtherance of the felony. This on the concept stated by the Appellate Division:

> The proximate cause theory, simply stated, is that when a felon sets in motion a chain of events which were or should have been within his contemplation when the motion was initiated, the felon, and those acting in concert with him, should be held responsible for any death which by direct and almost inevitable consequences results from the initial criminal act. [*State v. Canola,* 135 *N. J. Super.* 224, 235 (1975)].

Resistance whether by victim or police, and even unintended or accidental deaths which occur in the confused *res gestae* of violent felony, can hardly be deemed outside the contemplation of the initiator of such criminal violence.

SULLIVAN and PASHMAN, J.J., concurring in the result.

*For modification* — Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER and Judge CONFORD — 6.

*For affirmance* — Chief Justice HUGHES — 1.